David W. Sanford, D.C. Bar No. 457933*
Shayna Bloom, D.C. Bar No. 498105*
**SANFORD, WITTELS & HEISLER, LLP**
1666 Connecticut Ave., NW, Suite 310
Washington, DC 20009
Telephone: (202) 742-7780
Facsimile: (202) 742-7776

Grant E. Morris, D.C. Bar No. 926253*
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave. NW, Suite 310
Washington DC, 20009
Telephone: (202) 742-7783
Facsimile: (202) 742-7776

Mary Chapman, Nevada Bar No. 6591
**LAW OFFICE OF MARY F. CHAPMAN, LTD.**
7465 W. Lake Mead Blvd., Suite 100
Las Vegas, NV 89128
Telephone: (702) 562-1246
Facsimile: (702) 562-1247

*Attorneys for Plaintiffs*

***Pro hac vice application pending***

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **LYNDA KALEMIS,** ) <br> **RHODALYN VILLA, RANIA DANTE,** ) <br> **SABRA LAURSEN, and DOREET** ) <br> **HAKMAN,** ) <br> ) <br> **Individually and on Behalf of Others** ) <br> **Similarly Situated,** ) <br> ) <br> **And** ) <br> ) <br> **ADERO FLEMING,** ) <br> ) <br> **Individually,** ) <br> ) <br> **PLAINTIFFS,** ) | CASE NUMBER: <br><br> <u>**CLASS ACTION COMPLAINT**</u> |

|                                         |     |
|-----------------------------------------|-----|
| **v.**                                  | )   |
|                                         | )   |
| **FAIRFIELD RESORTS, INC.,**            | )   |
| **WYNDHAM VACATION RESORTS,**           | )   |
| **INC., and CENDANT CORPORATION,**      | )   |
| **INC.,**                               | )   |
|                                         | )   |
| **And**                                 | )   |
|                                         | )   |
| **WALTER LAXON, KEN ALEXANDER,**        | )   |
| **MASON GANGEL, STEVE COEN,**           | )   |
| **ART LOFTIN, GREG LIDDLE,**            | )   |
| **LARRY JOHNSON, PAUL SCIACCA,**        | )   |
| **TROY FUBLER, KEN GRAY,**              | )   |
| **PAUL HERMAN,**                        | )   |
| **MARK VAN SYDNER,**                    | )   |
| **DON WOOLBRIGHT,**                     | )   |
| **RICHARD ESCOVEDO,**                   | )   |
| **DEVON BOYD, TONY WALKER,**            | )   |
| **RALPH MADEIROS,**                     | )   |
| **and DEAN OWENS,**                     | )   |
|                                         | )   |
| **In Their Individual and Official**    | )   |
| **Capacities,**                         | )   |
| **DEFENDANTS.**                         | )   |
|                                         | )   |

## CLASS ACTION COMPLAINT

Class Representatives Lynda Kalemis, Rhodalyn Villa, Rania Dante, Sabra Laursen, and Doreet Hakman, and individual plaintiff Adero Fleming, by and through undersigned counsel, file this Complaint against Corporate Defendants Fairfield Resorts, Inc., Wyndham Vacation Resorts, Inc., and Cendant Corporation (collectively "Fairfield" or "Corporate Defendants"), and Individual Defendants Walter Laxon, Ken Alexander, Mason Gangel, Steve Coen, Art Loftin, Greg Liddle, Larry Johnson, Paul Sciacca, Troy Fubler, Ken Gray, Paul Herman, Mark Van Sydner, Don Woolbright, Richard Escovedo, Devon Boyd, Tony Walker, Ralph Madeiros, and Dean Owens (collectively the Corporate and Individual Defendants will be referred to as "Defendants") stating the following:

## I.   A SUMMARY OF PLAINTIFFS' SEXUAL HARASSMENT AND GENDER DISCRIMINATION SUIT AGAINST DEFENDANTS

1.      The Class Representatives and Class Members in this sexual harassment, gender discrimination and hostile work environment lawsuit are current or former female employees of Fairfield, one of the largest vacation ownership companies in the world.

2.      Female employees at Fairfield's Las Vegas, Nevada facility have been and continue to be subjected to sexual harassment, verbal abuse, physical violence, and gender discrimination Torquemadian in intensity.  As victimized Class Representative Villa explains, "harassment was a daily thing."

3.      Sexual harassment and gender discrimination are deeply engrained in Fairfield's corporate culture.  Fairfield Chief Executive Officer and President Franz Hanning ("CEO Hanning") has testified in a deposition that Fairfield's sexual harassment is related to the individual choices people make and the high energy employees Fairfield attracts.  CEO Hanning further testified that 1,000 witnesses may not be sufficient to corroborate allegations of sexual harassment.  CEO Hanning testified that as many as ten written warnings for sexual harassment in an employee's file do not preclude promotional opportunities with Fairfield.  Moreover, CEO Hanning testified that he was unsure if having pornographic material at Fairfield's facilities is a violation of company policy.

4.      The almost all-male managerial staff in Fairfield's Las Vegas facility formed a brotherhood of predators who bonded by terrorizing, intimidating, and victimizing female employees.  Their conduct includes, but is not limited to, the following:

> a.      Fairfield's male employees physically abused female employees at Fairfield's Las Vegas facility.  They groped female employees' buttocks and made attempts to grab female employees' breasts.  These assaults were neither

rare nor deviant happenstance, but occurred with such regularity that they became routine.

b.      Fairfield's male managers and other male employees demanded sexual favors from female employees and solicited female employees for sex.

c.      Fairfield male managers and employees would tell female employees, in graphic detail, about what they wanted to do to them sexually.  The male employees would openly ogle the females' body parts and objectify them in very crude language.

d.      Female employees of Fairfield who complained about the sexually hostile work atmosphere and/or practices of gender discrimination were targeted for retaliatory treatment and denials of promotion.

e.      Female employees were informally told by managers that in order to advance in the company, they should wear sexually revealing clothes.  Female employees witnessed this policy firsthand because if they did not conform to a standard of beauty and sex appeal, they were denied the benefits of being supervised and taught by experienced managers.  This would severely restrict their abilities to make money.

f.      Female employees are held strictly to Fairfield's company rules, while male employees are allowed to take liberal amounts of time off without question.

## II.      NATURE OF THIS ACTION

5.      Lynda Kalemis, Rhodalyn Villa, Rania Dante, Sabra Laursen, Doreet Hakman, and Adero Fleming bring this action against Corporate Defendants Fairfield Resorts, Inc., Wyndham Vacation Resorts, Inc, and Cendant Corporation, and Individual Defendants Walter

Laxon, Ken Alexander, Mason Gangel, Steve Coen, Art Loftin, Greg Liddle, Larry Johnson, Paul Sciacca, Troy Fubler, Ken Gray, Paul Herman, Mark Van Sydner, Don Woolbright, Richard Escovedo, Devon Boyd, Tony Walker, Ralph Madeiros and Dean Owens, under Title VII of the Act of Congress commonly known as "The Civil Rights Act of 1964," 42 U.S.C. §§ 2000(e) et seq., as amended ("Title VII"), Chapter 613 of Nevada Revised Statutes, Equal Opportunities for Employment, the Family and Medical Leave Act ("FMLA") and under the common law. Defendants have engaged in unlawful gender discrimination, sexual harassment, harassment on the basis of gender and unlawful retaliation, as well as assault, battery, intentional infliction of emotional distress, negligent and/or wanton supervision, training and retention, negligent and/or wanton hiring, and pregnancy discrimination.  The Class Representatives, all of whom are present or former Fairfield employees, bring this Class action against Fairfield and other Corporate and Individual Defendants, on behalf of themselves and all other female employees of Fairfield, who are similarly situated pursuant to federal law, Nevada law and the common law.

6.    The Class Representatives seek to represent all of the female employees described above who have been subjected to one or more aspects of the systemic gender discrimination described in this Complaint, including, but not limited to: a hostile work environment resulting from severe and pervasive sexual harassment in the workplace; discriminatory policies, practices and/or procedures in promotion and advancement; differential treatment on the basis of gender, and other forms of gender hostility in the workplace.  The systemic gender discrimination and sexual harassment described in this Complaint has been, and is, continuing in nature.

7.    The Class Representatives are seeking, on behalf of themselves and the Class they seek to represent, equitable and legal remedies, including declaratory and injunctive relief;

back pay; front pay; compensatory, punitive, and nominal damages; an award of attorney's fees, costs and expenses; and other incidental monetary and non-monetary remedies necessary to redress Fairfield's pervasive and discriminatory work environment, employment policies, retaliatory practices and/or procedures.

## III.    JURISDICTION AND VENUE

8.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and Title VII.  This Court also has supplemental jurisdiction over all state law claims alleged in this Complaint under 28 U.S.C. § 1367.

9.     Venue is proper in this Court in the District of Nevada pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f).  The unlawful employment actions alleged herein were committed by Defendants in the city of Las Vegas, Nevada.  Defendants transact business in the State of Nevada and the events giving rise to this claim occurred in the State of Nevada.  Many Class Representatives currently reside in Las Vegas, Nevada and worked for Defendants in Nevada.  Most of the records pertaining to Class Representatives' employment are or were maintained in Nevada.

10.     Class Representatives request a jury trial on all issues.

## IV.    CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII AND NEV. REV. STAT. 613.330

11.     The Class Representatives have fulfilled all conditions precedent to the institution of this action under the laws of the State of Nevada.  Class Representatives Kalemis and Villa, as well as Plaintiff Fleming, have filed timely charges with the Nevada Equal Rights Commission ("NERC").  In addition, after her termination from Fairfield on February 8, 2008, Class Representative Kalemis timely filed her complaint of retaliation with the Equal Employment Opportunity Commission ("EEOC"). Class Representative Doreet Hakman has

timely filed her complaint with the EEOC.  Class Representatives Dante and Laursen have filed timely charges with the EEOC and the Nevada Equal Rights Commission, respectively.  Both Dante and Laursen have obtained Notices of Right to Sue and filed suit in federal court within ninety days of receipt of their Notices of Right to Sue.

## V.   PARTIES

### A.   Class Representatives

12.   **Class Representative Lynda Kalemis** is a female citizen of the United States and a resident of Las Vegas in the State of Nevada.  Kalemis began her employment with Fairfield in October 2004 as a Tour Receptionist and was terminated on February 8, 2008. During her employment with Fairfield, Kalemis was subjected to gender discrimination, sexual harassment, a hostile work environment and retaliation.  Kalemis is a person aggrieved under Title VII of the Civil Rights Act of 1964, as amended.

13.   **Class Representative Rhodalyn Villa** is a female citizen of the United States and a resident of Las Vegas in the State of Nevada.  Villa was hired by Fairfield in May 2006 where she rotated through all departments as an intern for three months.  She then worked as a sales representative for two months and was transferred to Front Desk Reception for her remaining eight months at Fairfield.  During her employment with Fairfield, Villa was subjected to gender discrimination, sexual harassment, a hostile work environment and retaliation.  Villa is a person aggrieved under Title VII of the Civil Rights Act of 1964, as amended.

14.   **Class Representative Rania Dante** is a female citizen of the United States who resides in Clark County in the State of Nevada.  Dante was employed by Defendants as a Front-Line Sales Representative from approximately May 2001 until May 2003 and then as an In-House Senior Sales Representative until her constructive discharge in approximately April 2005. During her employment with Fairfield, Dante was subjected to gender discrimination, sexual

harassment, a hostile work environment, and retaliation.  Dante is a person aggrieved under Title VII of the Civil Rights Act of 1964, as amended.

15.    **Class Representative Sabra Laursen** (formerly Sabra Tuerck) is a female citizen of the United States who resides in Clark County in the State of Nevada.  Laursen began working at Fairfield's Las Vegas office on approximately October 5, 2005 and was forced to resign on August 1, 2006.  During her employment with Fairfield, Laursen was subjected to gender discrimination, sexual harassment, a hostile work environment, retaliation and pregnancy discrimination.  Laursen is a person aggrieved under Title VII of the Civil Rights Act of 1964, as amended.

16.    **Class Representative Doreet Hakman** is a female citizen of the United States who resides in Clark County in the State of Nevada.  Hakman began working at Fairfield's Harrah's Las Vegas facility in the fall of 2002 and was forced to resign on August 20, 2007.  During her employment with Fairfield, Hakman was subjected to gender discrimination, a hostile work environment and retaliation.  Hakman is a person aggrieved under Title VII of the Civil Rights Act of 1964, as amended.

   **B.    Individual Plaintiff**

17.    **Plaintiff Adero Fleming** is a female citizen of the United States and a resident of Las Vegas in the State of Nevada.  Ms. Fleming was hired by Fairfield in August 2005 as a Times Share Agent.  The following year, she worked as a Discovery Representative in Fairfield's Discovery Department and was terminated in January 2007.  During her employment with Fairfield, Fleming was subjected to gender discrimination, sexual harassment, a hostile work environment, retaliation and wrongful termination in violation of the FMLA.  Fleming is a person aggrieved under Title VII of the Civil Rights Act of 1964, as amended.

### C.     Defendants

18.     **Defendant Fairfield Resorts, Inc.** is a wholly owned subsidiary of Wyndham Vacation Resorts, Inc.   Fairfield Resorts is one of the leading resort and vacation product companies in the world, specializing in the development, marketing, and sales of innovative vacation ownership and leisure products.   Fairfield Resorts transacts business in the State of Nevada, has multiple facilities throughout the State of Nevada and has its national corporate headquarters located at 8427 South Park Circle, Orlando, Florida 32819.   Fairfield Resorts is an employer under Title VII and Nevada Revised Statute 613.310(2).

19.     **Defendant Wyndham Vacation Resorts, Inc**. is one of the world's largest providers of real estate and travel-related consumer and business services and is the owner of Fairfield Resorts.   Wyndham transacts business in the State of Nevada, has facilities throughout the State of Nevada and has its national corporate headquarters located in Orlando, Florida. Wyndham Vacation Resorts, Inc. is an employer under Title VII and Nevada Revised Statute 613.310(2).   Wyndham manages, oversees, designs policies for and/or makes decisions for Fairfield Resorts.   Some of the discriminatory actions described in this Complaint were authorized, ordered, and/or executed by Wyndham Vacation Resorts, Inc.'s officers, agents, employees, and/or representatives.

20.     **Defendant Cendant Corporation** is the former owner of Wyndham Vacation Resorts, Inc. and Fairfield Resorts, Inc.   In October 2005, Cendant completed its acquisition of Wyndham Vacation Resorts, Inc.   Cendant transacted and/or transacts business in the State of Nevada, had or has multiple facilities throughout the State of Nevada and its national corporate headquarters are located in Orlando, Florida.   Cendant is an employer under Title VII and Nevada Revised Statute 613.310(2).

21.     Defendant Walter Laxon ("Manager Laxon") worked for Fairfield from approximately May 2001 to the present in the capacities of Sales Manager and Senior Manager. Manager Laxon is sued in his individual and official capacities.

22.     Defendant Ken Alexander ("DOS Alexander" or "VP Alexander") worked for Fairfield from approximately October 2004 to the present in the capacities of Senior Sales Manager, Director of Sales and Vice President. VP Alexander is sued in his individual and official capacities.

23.     Defendant Mason Gangel ("Manager Gangel") worked for Fairfield from approximately May 2001 to the present in the capacity of Senior Sales Manager and Front-line Manager. Manager Gangel is sued in his individual and official capacities.

24.     Defendant Steve Coen ("VP Coen" or "Senior VP Coen") worked for Fairfield from approximately August 2005 to the present in the capacities of Vice President and Regional/Senior Vice President. Senior VP Coen is sued in his individual and official capacities.

25.     Defendant Art Loftin ("Manager Loftin") worked for Fairfield from started 2006 approximately October 2004 to approximately the fall of 2007 in the capacities of Sales Manager and Sales Representative. Manager Loftin is sued in his individual and official capacities.

26.     Defendant Greg Liddle ("VP Liddle") worked for Fairfield from approximately 1999 to approximately the fall of 2007 in the capacity of Vice President. VP Liddle is sued in his individual and official capacities.

27.     Defendant Larry Johnson ("Manager Johnson") worked for Fairfield from approximately May 2001 to the present in the capacities of Front-line Manager and Senior Manager. Manager Johnson is sued in his individual and official capacities.

28.     Defendant Paul Sciacca ("Sales Representative Sciacca") worked for Fairfield from approximately the end of 2004 to the present in the capacity of Sales Representative.  Sales Representative Sciacca is sued in his individual and official capacities.

29.     Defendant Troy Fubler ("Discovery Representative Fubler") worked for Fairfield from approximately October 2004 to approximately the fall of 2007 in the capacity of Discovery Representative.  Discovery Representative Fubler is sued in his individual and official capacities.

30.     Defendant Ken Gray ("Discovery Representative Gray") worked for Fairfield from approximately October 2004 to the present in the capacity of Discovery Representative.  Discovery Representative Gray is sued in his individual and official capacities.

31.     Defendant Paul Herman ("Discovery Representative Herman") worked for Fairfield from approximately August 2005 to the present in the capacity of Discovery Representative.   Discovery Representative Herman is sued in his individual and official capacities.

32.     Defendant Mark Van Sydner ("Sales Representative Van Sydner") worked for Fairfield from approximately May 2001 to the present in the capacities of Sales Representative, Manager, and Vice President.  Sales Representative Van Sydner is sued in his individual and official capacities.

33.     Defendant Don Woolbright ("Sales Representative Woolbright") worked for Fairfield from approximately August 2005 to approximately January 2007 in the capacity of Sales Representative and Manager.  Sales Representative Woolbright is sued in his individual and official capacities.

34.     Defendant Richard Escovedo ("Sales Representative Escovedo") worked for Fairfield from approximately at least August 2005 to the present in the capacity of Sales Representative.  Sales Representative Escovedo is sued in his individual and official capacities.

35.     Defendant Devon Boyd ("Manager Boyd") worked for Fairfield from approximately 2001 to the present in the capacities of Referral Front-line Manager, In-house Manager and Vice President.  Manager Boyd is sued in his individual and official capacities.

36.     Defendant Tony Walker ("VP Walker") worked for Fairfield from approximately May 2001 to approximately the summer of 2005 in the capacity of Vice President of in-house. VP Walker was sued for sexual harassment by a female employee and was fired in 2005.  VP Walker is sued in his individual and official capacities.

37.     Defendant Ralph Madeiros ("Vice President Madeiros") worked for Fairfield from approximately 2002 to approximately 2004 in the capacity of Vice President.   Vice President Madeiros is sued in his individual and official capacities.

38.     Defendant Dean Owens ("Senior Manager Owens") worked for Fairfield from approximately May 2001 to approximately the end of 2006 in the capacity of Senior Manager. Senior Manager Owens is sued in his individual and official capacities.

39.     Defendants are liable for their employees' unlawful acts and omissions against Class Representatives and Class members within the course and scope of their employment.

40.      The wrongful acts and omissions by Defendants' employees described in this Complaint were carried out in the course and scope of such employee's employment and/or in furtherance of the Defendants' business.

41.      Defendants condoned, authorized, and/or ratified such conduct.

## VI.    FACTUAL BACKGROUND

### Class Representatives

### A.    Lynda Kalemis

42.    Class Representative Lynda Kalemis began working for Fairfield in October 2004.  She worked as a receptionist in the Administration Department for over three years before being terminated on February 8, 2008 in retaliation for filing a Nevada Equal Rights Commission Charge of Discrimination against Fairfield.

43.    Throughout her employment with Fairfield, Kalemis has been subjected to and witnessed a systemic pattern and practice of sexual harassment, gender hostility and gender discrimination.

44.    Kalemis's manager, Samira Huremovic, had told Kalemis on several occasions that she would make an excellent Front Desk Manager.  Despite having worked at Fairfield for three years, and despite having a college degree, Kalemis was never given an opportunity to interview for the position.  Fairfield selected to interview a 19-year-old male, Alex, for the position.  Alex had no education beyond a high school degree and had only recently started working at Fairfield; Kalemis was thus more qualified than Alex to assume the position of Manager of Front Desk.  The position was ultimately given to Lakisha Richardson, who had a close relationship to VP Ken Alexander.

45.    During 2005 and 2006, Kalemis was subjected to sexual harassment from Sales Representative Brion Boykins.  Boykins would regularly offer her money in exchange for sex, claiming that spending one night with him would take care of her financially.

46.     Sales Representative Boykins was graphic and obscene when speaking to Kalemis, telling her which sexual positions he liked and which one he wanted to put her in.  He also made grunting noises whenever Kalemis walked by him in the workplace.

47.     Kalemis handled this harassment by ignoring Sales Representative Boykins or telling him to leave her alone.  Whenever she rejected his advances, Sales Representative Boykins would accuse her of not doing her job correctly and would make her work life difficult.

48.     Kalemis complained to Jennifer Hama from Human Resources (HR) in February 2007.  Kalemis asserted that Sales Representative Boykins's unwelcome advances and his retaliatory treatment upon her rejection of these advances were causing her great mental suffering and distress.

49.     HR Manager Hama was skeptical of Kalemis's story, but when Rhodalyn Villa confirmed Sales Representative Boykins' behavior, HR initiated an investigation.   Sales Representative Boykins worked at Fairfield throughout the investigation, but was ultimately fired in March 2007.

50.     Kalemis suffered retaliation as a result of the Boykins investigation.   The investigation was not confidential and it was common knowledge at Fairfield's Las Vegas facility that Kalemis and Villa were the two who had complained about Sales Representative Boykins's behavior.  Friends of Boykins would approach Kalemis and say, "I heard you got Boykins fired."  Kalemis was shunned at work by fellow male-coworkers and was consistently treated with disrespect.

51.     Throughout her employment, Manager Art Loftin similarly solicited Kalemis for sex.  At first, Manager Loftin commented that she should let him know when her boyfriend was no longer satisfying her needs.  Later on in her employment at Fairfield, Manager Loftin insisted

that Kalemis meet him for a sexual interlude at one of the casino's pools.  Manager Loftin also expressed his desire for Kalemis by pointing out that he was tiring of his wife.

52.     In November 2006, Director of Sales Ken Alexander solicited Kalemis for sex. He told her, "Let me know when you want to be with a real man and not with a little boy."

53.     In January 2007, Kalemis was in the ladies' restroom with co-worker Linda Duncan.  Duncan explained that she overheard male Sales Representatives discussing the female employees' bodies.  Duncan told Kalemis that she had heard many male employees attest that they enjoyed Kalemis's buttocks the best.  This made Kalemis uncomfortable and emotionally distraught.

54.     In approximately November 2007, Sales Representative Paul Sciacca yelled to Kalemis on the sales floor that she needed to hit the gym.  When Sciacca made this comment in November 2007, he yelled this in front of other co-workers at Fairfield.

55.     In approximately February 2007, Sales Representative Sciacca repeated his comment that Kalemis needed to go to the gym.  Sales Manager Walter Laxon then pulled Kalemis in front of all the males on the sales team and asked them if they thought Kalemis needed to lose weight.  Kalemis complained about this incident to HR and then-VP Ferdi Montes.  Upon information and belief, no reprimand was given to Paul Sciacca.  The embarrassment suffered by Kalemis caused her great mental and emotional harm.

56.     In approximately February 2007, sales manager Walter Laxon made aggressive, sexually charged comments to Kalemis and stated that he would have sex with her if he were not married.

57.     Throughout her employment, Discovery Representative Troy Fubler made comments about Kalemis's buttocks nearly every time she walked through the Discovery

Department.  He would shout comments such as, "you can't hide that butt," and "be proud of that butt."  Other men in the Discovery Department would encourage these remarks by laughing along.  Kalemis complained to then VP Ferdi Montes.  On information and belief, nothing was done by Fairfield to investigate this claim of harassment.

58.     In May 2007, Sales Representative Richard Escovedo told Kalemis that he liked her bottle-shaped figure.

59.     On June 15, 2007, Ken, the greeter at Fairfield's Las Vegas facility, blew kisses in Kalemis's ear and told her he would be checking her out.  The following day, he smacked her buttocks and informed her that he would be checking her out from the front and the back.

60.     On June 19, 2007, Kalemis attended a meeting at a Nevada resort.  Sales Representative Escovedo later told Kalemis that had he known she would attend the meeting, he would have secured a hotel room to ensure intimate moments for the two of them.

61.     On June 23, 2007, Sales Representative Escovedo told Kalemis that she should get a job "on a pole."

62.     On June 25, 2007, Kalemis went to see Dr. Gibson at Green Valley Family Doctors about the constant anxiety and panic attacks she was having as a result from the harassment and comments at work.  Dr. Gibson prescribed anti-anxiety medication, Busipirone, which Kalemis takes to this day.

63.     Kalemis filed a Complaint of Discrimination with the Nevada Equal Rights Commission (NERC) on September 19, 2007.

64.     In or about October 2007, Kalemis met with HR Manager Louise LNU and VP Ferdi Montes.  At the meeting, VP Montes and HR Manager Louise LNU asked Kalemis why she had filed a NERC complaint and to tell them what her real complaint was.  Kalemis

explained her complaint and said that the work environment was causing her anxiety.   HR Manager Louise LNU tried to convince Kalemis to transfer to another site.

65.     Approximately a week following the October 2007 meeting, Kalemis attended a follow-up meeting with VP Montes and HR Manager Louise LNU.   HR Manager Louise LNU said that Sales Representative Sciacca denied Kalemis's allegations.

66.     HR Manager Hama reiterated the suggestion that Kalemis transfer, saying that the company was afraid of Kalemis seeking retaliation.

67.     In January 2008, Kalemis's manager, Lakisha Richardson, and Administrative Manager Lisa Lupo began to harass Kalemis at work.   Managers Richardson and Lupo falsely blamed Kalemis some mistakes and violations, such as eating at the front desk.   Managers Richardson and Lupo wrote up Kalemis for the alleged errors, but Kalemis refused to sign the false reports.

68.     In January 2008, Manager Richardson also accused Kalemis of falsely calling in sick and incorrectly denoting referral tours on the tour sheet, an error that was actually made by other employees.   Manager Richardson wrote up Kalemis for these supposed infractions, but Kalemis refused to sign the false reports.

69.     On February 8, 2008, Manager Lupo fired Kalemis, in retaliation for her filing a NERC Charge of Discrimination against Fairfield and for participating in the NERC process. Manager Lupo said that she would have to let Kalemis go because of her "mistakes".

70.     On February 11, 2008, Kalemis received a letter from NERC dated February 4, 2008, outlining Fairfield's response to her allegations.

### B.    Rhodalyn Villa

71.    Class Representative Rhodalyn Villa worked at Fairfield from May 2006 until July 5, 2007.  For her first three months, Villa worked as an intern and rotated through every department.  For the following two months, Villa worked as a Sales Representative on the sales floor.  Villa's remaining months were spent working in Reception at the Front Desk.  Villa was terminated on July 5, 2007 allegedly as a result of attendance and tardiness issues.

72.    Throughout Villa's employment with Fairfield, she was subjected to and witnessed a systemic and ongoing pattern and practice of sexual harassment, gender hostility and gender discrimination.

73.    Villa first encountered discrimination based on gender during her internship program with Fairfield.  Villa noticed that managers gave the male interns many opportunities to go on rides, but she was never asked.

74.    Sexual harassment was a daily struggle for Villa.  Males from the Sales Department would routinely make comments about her breasts and constantly ask her out on dates.  Senior In-House Representative Steven Fast once commented during internship training that Villa could go far in Fairfield so long as she gave something back in return.  Representative Fast's comment came on the heels of his remark that he would like to have a "playdate" with Villa, after which Fast gave Villa his card.

75.    In October 2006, while Villa worked as a Sales Representative, Senior Vice President Steve Coen pulled Villa aside from the sales floor to ask which department she would like to work in.  Villa had previously asked to go to the Discovery Department, where she could earn $48,000 per year plus commission, but Senior VP Coen responded, "With your pretty smile you would be more valuable in the front."  Senior VP Coen said that he would like to move Villa

to the front desk as training for an Office Manager position. Senior VP Coen said that he expected Villa to be able to move to an Office Manager position within one year. Villa decided to accept a front-desk position with pay of $22,000 per year and expected to move into an Office Manager position within a year, a job with a salary of $65,000 and a relocation bonus of $20,000 (anticipating a transfer to California).

76.     While walking through the Discovery Department, Villa could hear comments being made about her buttocks. The manager of the Discovery Department, Richard, was present during many of those comments and condoned the behavior through his silence.

77.      On one occasion when Villa wore her hair up, Sales Representative Richard Escovedo told her, "You look like a sexy librarian. I want to take you down."

78.      Director of Sales Ken Alexander ("DOS Alexander") would also make inappropriate remarks when Villa removed her jacket, and he would often ask Villa out on dates during the period when Villa worked as a sales representative and as a tour receptionist at the front desk.

79.     Often, at the end of the workday, DOS Alexander would stand in one spot to comment on Villa's appearance or on what Villa might be doing after work. As a result, Villa tried to avoid DOS Alexander's remarks by taking a different route or by finding a co-worker, Javin Gooden, to walk out of the building with her.

80.     The greeter at Fairfield, Ken, frequently tried to give Villa kisses and hugs.

81.     Sales Representative Kurt Peez would slap Villa's buttocks and make comments to her about how much he enjoyed looking at her breasts.

82.     While working as a Sales Representative in Harrah's Casino for Fairfield, Villa was constantly subject to sexual harassment, especially from Senior Sales Representative Brion

Boykins.  Approximately two weeks after Villa began working at Harrah's, Boykins told her, "Girls your age don't want to be wined and dined.  I'll give you money up front if you spend time with me."  Villa noticed Sales Representative Boykins saying the same kinds of comments to a new Sales Representative, Tina Smith.  Villa complained to her manager, T.A. Bragg, but he was not responsive and never investigated Villa's claims of harassment.

83.     Villa, along with tour receptionist Lynda Kalemis, suffered retaliation as a result of complaining about the harassment they received from Sales Representative Boykins.

84.      After HR spoke to Villa about Sales Representative Boykins's harassment against her and Kalemis, HR initiated an investigation.

85.     Before the Boykins investigation, Senior VP Coen promised Ms. Villa that she would be promoted to the Office Manager position.  After Villa complained about top seller Boykins and the investigation began, Senior VP Coen became non-committal whenever Villa raised the prospect of her promotion.  Sales Representative Boykins avoided interacting with Villa and even refused to make eye contact.

86.     Other managers also avoided Villa after the Boykins investigation began.  As a result, Villa's selling ability was compromised.

87.     Due to the retaliation Villa faced as a result of her complaints about Boykins, she was too afraid to make further complaints about anyone else at Fairfield.

88.     Villa was terminated on July 5, 2007.

**C.     Rania Dante**

89.     Class Representative Rania Dante worked for Fairfield from May 2001 until her constructive discharge in approximately April 2005.  Defendants discriminated against Ms.

Dante because of her sex, female.  Defendants denied Dante equal treatment in the terms and conditions of her employment, harassed her and eventually constructively discharged her.

90.     On a continuing basis through approximately April 2005, Defendants denied Dante equal treatment.  Specifically, Defendants did not give Dante equal consideration or opportunity for advancement within the organization.  Defendants treated younger, less experienced sales associates preferably with regard to advancement.

91.     Before Dante joined the defendant companies, Vice President Greg Liddle ("VP Liddle") aggressively recruited her for many years to work for Fairfield because she speaks 6 languages and was one of the proven top producers in the vacation timeshare industry, known as "the three-million-dollar woman."

92.     Vice President Liddle promised to triple Dante's income and give her a senior sales agent in-house position if she became employed with Defendants.  In-house employees are typically top producers and more experienced sales agents.  They work with more qualified and established owners, unlike front-line employees who primarily work to establish relationships with new clients.  In-house positions are more prestigious, have a higher closing ratio, and earn a higher base rate of commission than front-line positions, resulting in higher income for in-house employees.

93.     On one occasion, Dante's friend Aubrey Alexander took Dante to a Fairfield office holiday party at which Dante met Vice President Liddle.  Shortly thereafter, VP Liddle told Alexander that if he had known Dante was "so gorgeous and sexy," he would have flown to New York himself because he would like to have Dante work "under him."

94.     In approximately May 2001, Dante rejected offers from many other vacation and resort companies to accept an in-house senior salesperson position at Fairfield.  VP Liddle told

Dante that she would temporarily be hired as a front-line sales associate in order to learn how the company worked, but would move into an in-house senior salesperson position one month later. VP Liddle said to Dante that in the in-house position would be triple the income Dante received as a front-line employee.

95.     VP Liddle would only be able to supervise Dante if she worked as a front-line employee.

96.     In approximately June 2001, after Dante had worked as a front-line salesperson for approximately one month, VP Liddle refused to move Dante to an in-house position as promised because she refused to have a sexual relationship with him.

97.     VP Liddle continually asked Dante to have a sexual relationship with him and asked her out on dates.  He told Dante that he liked to watch his ex-girlfriend, who also worked at Fairfield, have sex on the office desk with many different men.  Dante was in a long-term relationship at the time and told VP Liddle that she was not interested.

98.     VP Liddle harassed Dante physically as well as verbally.  One day in his office, VP Liddle tried to kiss Dante, but Dante expressed disinterest.  On other occasions, VP Liddle grabbed Dante's breasts and buttocks.  Because she did not respond favorably to VP Liddle's advances, Dante was punished and not moved to an in-house position until May 2003, two years after beginning her employment at Fairfield.

99.     Front-line Manager Larry Johnson, who was directly in charge of Dante, also asked her to have sex with him on several occasions.

100.    Manager Johnson also made derogatory and sexual remarks about Chireen Ness, a female co-worker.  He said he was keeping her on staff even though she was not selling because he wanted to "look at her ass and have sex with her."

22

101.    Mark Van Sydner, a coworker of Dante's, continually groped her in inappropriate places, sometimes in front of clients.  When Dante complained to Manager Johnson about Van Sydner's behavior, Manager Johnson would be dismissive and not reprimand Van Sydner.  Van Sydner has since been promoted to a Vice President position with Fairfield in Hawaii.

102.    In approximately May 2004, Dante won the companywide "Top In-House Producer of the Year" award and the President's Club Legend Award after breaking many sales records.  She brought in over $2,200,000 in seven months, along with $600,000 while working in front-line sales.  The President's Club Legend Award typically takes over five years to win, but Dante won it in just two years.  She received a handwritten congratulatory letter from the company's CEO, Franz Hanning.

103.    Tony Walker, Dante's supervisor and Vice President of in-house at Fairfield, refused to nominate Dante for the industry's American Resort Development Association ("ARDA") awards ceremony, despite her clear performance as the top in-house producer in 2004.  When Dante asked Walker why he refused to nominate her for an ARDA award, he said he was disappointed that Dante would be representing Fairfield.  He said he would have preferred Fairfield to be represented by a "White, American, WASP-y guy like me, rather than people like you, an Arab with an accent."  Dante was not even given tickets to attend the awards ceremony, although other employees did receive them.

104.    In approximately May 2004, Vice President Walker was speaking on the phone about an older female applicant.  In front of Dante, who was in his office, Vice President Walker said to the person on the phone, "Why are you sending me this 42-year-old bitch? You know I want to have my dick sucked by younger girls."

105.     Despite being the top producer and having the best closing ratios, VP Walker and VP Liddle refused to promote Dante to a senior salesperson position from 2001 until 2004.   VP Walker and VP Liddle did, however, choose to promote less qualified individuals to the more senior positions.

106.     Another Fairfield employee, Thomas Felicetty, gave Dante a sworn statement that he heard Manager Boyd call an African colleague a "jungle bunny."  Felicetty also saw Van Sydner sexually harass and grope Dante and others on many occasions.

107.     Dante complained to Human Resources several times as well as to Vice President Ralph Madeiros, Vice President Tony Walker, and Vice President Travis Barry about the harassment she suffered at Fairfield, but the Company took no action to stop the harassment. Vice President Tony Walker was sued by another female employee for sexual harassment and was eventually fired in 2005.   Cecile Maino, director of in-house HR, also covered up for Dante's harassers despite receiving many letters from Dante.

108.     Defendants retaliated against Dante because of Dante's complaints by refusing Dante lucrative opportunities in the company and taking profitable referrals from Dante and giving them to younger, less-qualified employees.   Dante's in-house commissions fell dramatically, from $30,000-$60,000 per month to about $200 per month at the time of her termination.

109.     In approximately March 2005, Dante requested and later received leave according to the Family Medical Leave Act due to a fractured vertebra.

110.     Dante was constructively discharged in approximately April 2005.

**D.     Sabra Laursen**

111.    Class Representative Sabra Laursen ("Laursen") was hired by Defendants at Fairfield's Las Vegas facility on or about October 5, 2005.  Her last position of record was Sales Manager.  Laursen previously worked for Fairfield Resorts properties in other locations for approximately eight years prior to being hired in Las Vegas.

112.    At all times during her employment, Laursen performed her job satisfactorily and was a top producer.

113.    In or about December 2005, Laursen called the hotline made available for employee complaints by Defendant Cendant Corporation to complain that she was subject to abusive treatment by a male manager at Fairfield.  Laursen was concerned for her safety.  No action was taken regarding her complaint and the coworker was permitted to interfere with her position ever since she reported the threat.

114.    On approximately January 21, 2006, Laursen revealed to her supervisors that she was pregnant and applied for family leave.  It was soon discovered that Laursen was carrying twins and Laursen developed complications during the early stages of her pregnancy.

115.    Because Laursen's position as a sales manager required her to supervise a team of sales personnel and often to work twelve to thirteen hours a day, most of the time standing or walking, Laursen requested on several occasions to go home early due to problems with her pregnancy.  On each occasion, Laursen was criticized for not being able to do her job, or her request was denied.  On information and belief, male employees' requests for time off based on less compelling reasons were routinely granted and not subjected to criticism.

116.    On or about February 15, 2006, in front of other managers, including Managers Walter Laxon, Mason Gangel, Dean Owens, and Vice Presidents Patti Coen, Frank Drozd, Art

Loftin, and Rick Zipp, Senior Vice President Coen told Laursen that if she could not handle the job while she was pregnant, she should step down; otherwise, he would exercise his authority and make Laursen step down.

117.    Other senior managers continued to pressure Laursen to work the long hours that she previously worked, compromised her medical privacy, and humiliated her in front of other managers and employees.  Other senior managers also falsely represented to upper level management at Fairfield that Laursen was taking a excessive amount of time off and that Laursen was not performing competently.

118.    On the day that Laursen went through a painful surgical procedure and learned that one of her twins had not survived, she told her supervisor, Senior Manager Dean Owens about the situation and asked to go home after eight hours of work.  Senior Manager Owens told her that she had to stay.  Laursen worked thirteen hours that day.

119.    In early March 2006, Laursen was informed that she had lost the second twin.  In her absence over the next few days, Senior VP Coen assigned Laursen's sales team to Michael Alvarez, who had less seniority than Laursen as a sales manager.  Laursen learned that VP Coen told her team that he did not want them to "suffer" any longer and that he was not sure Laursen was coming back.  Laursen alleges that Alvarez was given the advantages of additional staff and assistance that were denied to her and also generally denied to other women managers. Laursen also alleges that Alvarez was given lucrative tours, an advantage denied to Laursen.

120.    Upon Laursen's return to work, Defendant's harassment escalated to the point where she was called into Senior VP Coen's office in the presence of Defendant Fairfield Resort's Human Resources Director.  Senior VP Coen yelled at Laursen and threatened her, physically and verbally, and made repeated attempts to provoke her into resigning.

121.   Laursen alleges that women have been treated less favorably than men by Defendants in terms of opportunities to succeed and adherence to company rules within a hostile work environment.  Female sales staff members have been regularly denied the benefits of being supervised and taught by experienced managers, as well as the more productive sales employees on their sales teams, all of which restrict their abilities to make money.  In addition, women are held strictly to the companies' rules, while males are allowed, for example, to take liberal time off without question.  Furthermore, Defendants have a history of demeaning treatment of women employees to the point that a hostile work environment has long existed and is unabated.

122.   On or about March 7, 2006, Laursen told Defendant Fairfield Resorts Senior Vice President Coen that she believed that she was being discriminated against on account of her pregnancy, reporting that Owens had refused to let her go home early on the day that she miscarried her first twin and described above.  Senior VP Coen took no action to address her complaints, but instead escalated the discriminatory and harassing treatment toward Laursen.

123.   On or about August 1, 2006, Laursen was forced to resign because she was neither given the staff nor assistance to make enough money on the job to survive despite her repeated requests.

124.   On July 24, 2006, Laursen filed an administrative charge of discrimination with the Nevada Equal Rights Commission (NERC), and on approximately December 30, 2006, she received a Right to Sue letter from NERC.

**E.     Doreet Hakman**

125.   Class Representative Doreet Hakman worked in Fairfield's Harrah's Las Vegas facility from the fall of 2002 until August 20, 2007 as a Sales Representative.  From 2006 to June

2007, Hakman was placed on the Referral line and the Top Producer/Owner Customer Service line.

126.    Throughout Hakman's time at Fairfield, she was subjected to and witnessed a systemic and ongoing pattern and practice of sexual harassment, gender hostility and gender discrimination.

127.    In late 2005, Hakman was qualified to be chosen for the Elite Team based on her successful tenure.  The Elite Team, invented by Fairfield VP Steve Coen, included about ten people and had its own meeting room and was assigned its own tours.  Every day, one member of the Elite Team would do a sales presentation, and all Elite Team members would share in any commissions resulting from that presentation.  Elite Team members received higher, more certain earnings as a result.  Several relatively new and inexperienced sales representatives were placed on the Elite Team, but Hakman was not.

128.    After being passed over for the Elite Team, Hakman decided to seek a new job and met with Director of Sales Richard Weiscerzack ("DOS Weiscerzack") upon receiving an offer outside of Fairfield.  DOS Weiscerzack told Hakman that she could earn a spot on the Elite Team by selling over $100,000 the next month.  Upon information and belief, Hakman was the only sales representative qualified for the team who was told to earn her place.  Hakman decided to remain at Fairfield and attempt to qualify for the Elite Team.

129.    After selling over $100,000 the next month, Hakman attended Elite Team meetings.

130.    At one of those meetings, VP Coen, HR Director Don Winston and DOS Weiscerzack were also present.  At this meeting, Hakman was harassed by her coworkers, who claimed Hakman's presence was hurting their performance (despite the fact that Hakman's sales

28

numbers were higher than those of the complaining employees).  Hakman left the Elite Team meeting in tears.

131.    VP Coen subsequently announced that Hakman was no longer on the Elite Team because she cried and excused herself from the meeting.  Hakman filed a complaint with HR after VP Coen told Hakman that she was no longer on the Elite Team, but VP Coen told her to retract the complaint.

132.    After being removed from the Elite Team, Hakman requested a transfer to Fairfield's Grand Desert Resort in Las Vegas.  HR Director Winston offered Hakman a transfer to Trendwest instead, which she refused because she wanted to stay within Fairfield.

133.    After being removed from the Elite Team, Hakman also asked VP Coen if she could obtain a Podium Presenter position.  This position was considered desirable because Podium Presenters presented to entire groups of potential buyers and received 3% commission for each buyer, which was equivalent to the commission received by the representative on each actual sale.  VP Coen told Hakman that no such positions were available, but that he would let her know if one became available.

134.    On two separate occasions, Hakman found out about Podium Presenter auditions at Fairfield's Grand Desert Resort in Las Vegas (run by Patty Coen, wife of VP Coen) on her own; VP Coen did not inform her of the openings as he had promised.  Hakman auditioned for the positions, but was rejected in favor of less experienced male applicants; in one case, the chosen applicant was not even in the Sales Department.  Additionally, in 2007, Hakman learned that a Podium Presenter position at Harrah's had been given to a male Sales Representative without an audition being held.

135.    Hakman began asking for promotion to a manager position in early 2006.  DOS Weiscerzack agreed that Hakman was a good candidate for promotion.  DOS Weiscerzack transferred to another resort two months later, so Hakman approached VP Coen around April 2006.  VP Coen laughed at her request.

136.    On July 9, 2006, Hakman returned to work after two scheduled days off and found out that VP Coen had fired her.

137.    Hakman reported her firing to HR Director Don Winston, who had not been told that Hakman had been fired.  HR Director Winston agreed to investigate.

138.    On July 10, 2006, HR called Hakman to say there had been a mistake and that she should attend a meeting on July 11, 2006.  At the meeting with VP Coen and HR representatives, VP Coen apologized, saying that he now knew that he should not have fired her.  VP Coen asked how he could make amends, so Hakman asked for a manager position.  VP Coen agreed and said that he would mentor Hakman himself, asking her "can you stand the heat?"

139.    A week passed with no word from VP Coen about training.  Hakman asked HR Representative Watson to look into this matter.  HR Representative Watson responded with a letter from VP Coen stating that Hakman was not yet qualified for a manager position and giving her a list of qualifications that she would need to obtain.  Upon information and belief, Hakman was the only manager candidate given such a list.

140.    In mid-2007, Manager Meyers took Hakman off of the Referral line and the Top Producer/Owner Customer Service line, which was a demotion.  Hakman received inferior tours and no assistance toward a promotion.

141.    Following these problems with Manager Meyers and VP Coen, Hakman asked HR to be relocated because she could not tolerate working with VP Coen anymore, and even

interviewed for a job at the Fairfield Grand Desert Resort in June 2007. VP Coen denied Hakman's transfer request, and the Grand Desert Resort rejected Hakman despite the endorsement of the Grand Desert's Director of Sales. Hakman was instead transferred to Fairfield Manager Walter Laxon's team.

142.   At the end of July 2007, Hakman finally managed to relocate to the front-line division at Fairfield's Grand Desert Resort. However, by this time, VP Coen was in charge of the resort as well as Harrah's. Hakman continued to receive inferior tours and left Fairfield on August 20, 2007 as a result.

**Individual Plaintiff**

**F.     Adero Fleming**

143.   Class Representative Adero Fleming worked in Fairfield's Las Vegas facility from September of 2005 until January 2007. She worked first as a Time Share sales agent and then as a Discovery representative.

144.   Throughout her employment with Fairfield, Fleming was subjected to and witnessed a systemic and ongoing pattern and practice of sexual harassment, gender hostility and gender discrimination.

145.   Dean Owens, Fleming's manager in her first six months at Fairfield, recommended that Fleming contact a top selling representative, "Spoon," who worked for Fairfield at the Grand Desert/Fairfield Sales Center in Las Vegas. Fleming contacted Spoon and met with him at a restaurant in Las Vegas. At the meeting, Spoon recommended that Fleming work for Spoon and his escort service at night in order to supplement her income. Fleming told Spoon she was not interested.

146.    Sales Representative Brion Boykins was a constant source of sexual harassment for Fleming.  They had started their training at Fairfield together, but once Sales Representative Boykins began making big sales, he would tell Fleming, "If we get together a couple of nights a week, I can help you out financially.  I can give you another kind of training."

147.    Time passed and Fleming had still not made a sale.  Sales Representative Boykins again propositioned her—this time requesting that she become his housekeeper.

148.    Sales Representative Boykins also verbally reduced Fleming to the level of a stripper.  Sales Representative Boykins told her one day that he was going to a strip-club that evening, but that he would prefer to put the cash in her pocket rather in the strippers'.  Fleming objected to his sexual advances, but Sales Representative Boykins persisted.   Sales Representative Boykins said that he would make Fleming a couple of hundred dollars if she would kiss him.

149.    Fleming never went to complain at Human Resources because she noticed that action was never taken against the high-selling representatives for misdeeds.  Because Sales Representative Boykins was a top seller for the company, Fleming knew that her complaints would be ignored and that it behooved her to keep silent about Sales Representative Boykins.

150.    Fleming witnessed Sales Representative Boykins talking about women who were voluptuous and frequently made loud comments about other women's buttocks.  Many employees and managers overheard these comments.

151.    Sales Representative Boykins told Fleming that he used to be a pimp in Indiana.  After making insinuating comments to Fleming about how he used to convince girls to become his prostitutes, Fleming asked, "Are you trying to pimp me?"  Sales Representative Boykins responded that money and sex go hand in hand.

152.     Fleming knew that Fairfield's sexual harassment policy was meaningless because she often witnessed upper management violating the policy.  For example, Fleming often heard Senior Manager Walter Laxon describing his lust for sales representative Jody Kojima.  Manager Laxon said at one point, "If I were just 20 years younger, I would drop everything to have sex with her."  Fleming heard such comments regularly during her tenure at Fairfield.

153.     Another Senior Manager, Mason Gangel, would laugh and encourage Laxon's comments.  On one occasion, Fleming heard Manager Laxon beckon Manager Gangel to check out Jody Kojima.  Kojima was wearing a low-cut top and had one leg on the chair and one leg off.  Gesturing to Kojima, Manager Laxon said, "Now that is a sight to see!"  Manager Gangel responded, "I just love coming in to work on days like this."  The men knew that Fleming and other female representatives could hear this conversation because female representatives were standing nearby.

154.     The only occasions on which the male senior managers would conform to the sexual harassment policy was when the female Senior Vice President, Rita Bruegger, made an appearance at the facility.

155.     Fleming recalls that during continual training, male sales representatives would comment about how women could use their "other attributes" to make sales.  On one occasion, Vice President Steve Coen agreed and instructed the female sales representatives to "use your assets to the best of your abilities."

156.     The Fairfield facility in Las Vegas engages in gender discrimination because women are only given advancement opportunities when they dress in a sexually provocative way.  Fleming became aware of the importance for women to dress scantily when she saw the care and attention Jody Kojima and Diana Hamilton were receiving on their sales.  Kojima and

Hamilton wore very form-fitting clothing, and it paid off.  Fleming would hear managers say, "Damn, did you see Diana [Hamilton] today? Damn that girl has an ass! I want to tap that!" Fleming noticed that managers would attend carefully to Hamilton's table and help her close.

157.    In order for a sales agent to close a sale, a manager needed to physically come over to the representative's table.  Fleming began to notice that if a female sales representative was not sexually provocative, this was unlikely to happen.  Fleming realized that dressing professionally was not going to help her advance at Fairfield.  Therefore, Fleming decided to wear a low-cut summer dress with black heels one day.  Manager Art Loftin noticed her and closed a big sale for her.  Manager Loftin had never before closed a deal for Fleming.  After the sale was closed, Manager Loftin commented to Fleming, "Maybe you better start wearing more revealing dresses to get more sales."

158.    During her tenure at Fairfield, Fleming only witnessed one manager, Sabra Laursen, chastise an employee for demeaning women.  This was during a training module that Laursen was conducting.  A male employee said, "I like it when you ladies turn over your tables. It's kind of exciting."   Laursen became angered and explained that such comments were unacceptable.  Fleming had never heard any other manager support the sexual harassment policy.

159.    Fellow   Sales   Representative   Don   Woolbright   articulated   the   gender discrimination rampant at Fairfield on one occasion while he was hitting on Fleming.  Sales Representative Woolbright explained that managers didn't think the female sales representatives had anything to offer.

160.    Sales Representative Woolbright told Fleming that she was wasting her time working at Fairfield and that she should be pursuing acting and modeling instead.  Sales Representative Woolbright then started to make sexual advances, but Fleming refused.

161.    A fellow sales representative, Chris, who was recruiting from Westgate out of Florida, asked Fleming to give him oral sex in the break room at Fairfield.  Chris Hawkins, another sales representative, was present.  Fleming was appalled and asked him if he even attended the sexual harassment training.  Chris's response was that there is training on the one hand, but there is what's really going on, on the other hand.

162.    During her stint in Fairfield's Discovery Department, Fleming was subjected to relentless sexual harassment.  On a daily basis, Fleming and the other women who worked in Discovery were at the mercy of Discovery Representatives Ken Gray, Paul Herman, and Troy Fubler.  These three individuals would constantly make comments to Fleming about her looks and drop things in order to ask her to pick them up so that they could see Fleming from behind.

163.    One day Fleming wore red to work, and Discovery Representative Ken Gray said, "You look ready for Christmas. Why don't you sit on Santa's lap [gesturing to his lap] and tell him what you want for Christmas?"

164.    Whenever Fleming would walk by, the Discovery representatives would holler at her about her body.  At one point, when Fleming took off her sweater, she heard male representatives yell, "Look what rolled in today!"

165.    As time progressed in the Discovery Department, the harassment that surrounded Fleming got worse.

166.    Fleming also noted that the men in Discovery would harass Lynda Kalemis on a constant basis.  When at one point Kalemis bent over, Discovery Representative Fubler said loudly, "Mmm, I like what I see!"  On another occasion, Kalemis wore black pants to work.  Discovery Representative Gray told her, "No matter what you do, you can't hide that ass!"

167.    Discovery Representatives Herman and Fubler would also make comments about Jody Kojima's chest.

168.    Fleming witnessed a great deal of pregnancy discrimination.  Sabra Laursen was a manager, but when she became pregnant, much of her sales team was transferred to another manager. After her miscarriage, Laursen returned to work to find her team severely reduced.

169.    In the fall of 2006, Fleming often requested to go home early for both health-related reasons and to check on her mother.  Discovery Department Manager Richard Rebollah consistently denied her requests.  During the same period, Discovery Representative Troy Fubler often came to work inebriated was not reprimanded, and Discovery Representative Ken Gray was often given permission to work half-days, a tactic he used to leave work after making a deal. When Fleming confronted Manager Rebollah about Sales Representative Gray's behavior, Manager Rebollah told Fleming that he would more strictly adhere to the rules.  However, Manager Rebollah did not follow through.

170.    Fleming then requested FMLA leave, on Manager Rebollah's recommendation. However, when Fleming went to Manager Rebollah for his signature, he criticized her for asking.  Manager Rebollah told Fleming that if he had known that Fleming would have these issues, he would never have let her come into his department.  Fleming told him that she could not have known that she would need surgery or that her mother's home would be broken into.

171.    Fleming did eventually obtain 12 weeks of FMLA leave and was expected to return to work on January 11, 2007.

172.    On January 11, 2007, Fleming was in the hospital under sedation. She was thus unable to call in and then could not return to work that week.

173.   On approximately January 17, 2007, Fleming was told that she had been terminated from her employment at Fairfield Resorts.  She spoke with HR manager Jennifer Hama, who said that since Fleming had not returned to work on January 11, 2007, she had been terminated for job abandonment.

174.   After discussions with the corporate office, Fleming's termination became nominally an administrative termination.  Fleming did not receive the benefits of an administrative termination, including the ability to reapply and get rehired for a job within six months.

## VII.   CLASS ACTION ALLEGATIONS

### A.   Class Definition

175.    The Class Representatives seek to maintain claims on their own behalf and on behalf of a Class of current and former Fairfield employees.  Each of the Class Representatives is a member of the Class.

176.   The Class consists of all females who are, or have been, employed by Fairfield at any time during the applicable liability period.  All of the Class Representatives are proposed representatives of the Class.  Upon information and belief, there are hundreds, if not thousands, of members of the proposed Class.

### B.   Efficiency of Class Prosecution of Common Claims

177.   Certification of a Class of female employees similarly situated to the Class Representatives is the most efficient means of resolving the questions of law and fact which are common to the claims of the Class Representatives and the proposed Class. The individual claims of the Class Representatives require resolution of the common question of whether Fairfield has engaged in a systemic pattern and/or practice of gender discrimination and sexual

harassment against female employees. The Class Representatives seek remedies for the following reasons: to eliminate the adverse effects of such treatment in their own lives, careers, and working conditions; to eliminate the adverse effects in the lives, careers, and working conditions of the proposed Class members; and to prevent continued gender discrimination and sexual harassment in the future. The Class Representatives have standing to seek such relief because of the adverse effect that Fairfield's conduct has had on them individually and on females generally. In order to gain such relief for themselves, as well as for the Class members, the Class Representatives will first establish the existence of systemic gender discrimination and sexual harassment as the premise for the relief they seek. Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Certification of the proposed Class of females who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives, the proposed Class, and Fairfield.

178. The Class Representatives' Class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment of claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method for resolving such common issues.

### C.   Numerosity and Impracticability of Joinder

179. The Class which the Class Representatives seek to represent is too numerous to make joinder practicable. The proposed Class consists of hundreds, if not thousands, of current and future female employees in Las Vegas, Nevada, during the liability period.

**D.     Common Questions of Law and Fact**

180.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the putative Class they seek to represent.  The common questions of law include, *inter alia*: (a) whether Fairfield has engaged in unlawful, systemic sexual harassment; (b) whether Fairfield has engaged in unlawful, systemic gender discrimination in its pay, promotion, advancement, compensation policies, practices, and/or procedures, and in the general terms and conditions of work and employment; (c) whether Fairfield is liable for a continuing systemic violation; and (d) a determination of the proper standards for proving a pattern or practice of gender discrimination and sexual harassment by Fairfield against its female employees.  The common questions of fact would include, *inter alia*, whether, through its policies, practices, and procedure:

        a.     Fairfield has subjected females to sexual harassment, including but not limited to inappropriate and unwelcome touching, sexual comments about female employees' bodies, and unwelcome sexual propositions;

        b.     Fairfield has subjected females to other forms of gender hostility and a sexually hostile work environment;

        c.     Fairfield has engaged in a pattern and practice of failing to take prompt and effective action to remedy the hostile work environment based on gender;

        d.     Fairfield has maintained policies and procedures that condone sexually harassing behavior towards female employees and gender hostility in the workplace; or alternatively, maintained policies and procedures which do not adequately prevent sexually harassing behavior and gender hostility, and thus allow for their continued

existence; or alternatively, maintained policies and procedures that may prohibit sexual harassment and gender hostility, but that have not been applied properly, have not been understood by managers and employees and/or have been interpreted in a subjective and inconsistent manner, and thus have adversely affected female employees;

       e.     Fairfield has maintained a hostile work environment based on gender;

       f.     Fairfield has denied or delayed promotions and promotional opportunities for females; and

       g.     Fairfield has subjected females to differential and inequitable treatment, including but not limited to less preferable and less profitable work assignments.

181.    The employment policies, practices, and/or procedures to which the Class Representatives and the Class members are subjected are set at Fairfield's corporate level and apply universally to all Class members.

182.    Throughout the liability period, a disproportionately large percentage of the managers and supervisors at Fairfield have been male.

183.    Gender discrimination in selection, promotion, and advancement occurs as a pattern and practice throughout all levels and all divisions of Fairfield. Selection, promotion, and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection, and interaction between male managers, supervisors, and subordinates, rather than by merit or equality of opportunity. As a result, male employees have advanced and continue to advance more rapidly to better and higher paying jobs than do female employees.

184.    Fairfield's policies, practices, and/or procedures have had an adverse impact on females seeking selection for, or advancement to, better and higher paying positions. In general,

the higher the level of the job classification, the lower the percentage of female employees holding it.

185.    Fairfield's female employees have also received differential treatment which discourages them from seeking professional advancement.  For example, male managers have propositioned female employees for sexual favors in exchange for career advancement, insulted the intelligence and destroyed the self-esteem of female employees, required female employees to perform degrading work not included in their job descriptions, and made it clear in various other ways that they prefer male employees.

186.    Additionally, sexual harassment occurs as a pattern and practice throughout all levels and all divisions at Fairfield.  Female employees are routinely subjected to inappropriate sexual comments, uncomfortable touching, hugging and kissing, unwelcome sexual advances and other forms of sexual harassment.  Sexual harassment is routinely practiced by male managers toward female subordinate employees.

187.    Numerous female employees at Fairfield have repeatedly complained about the sexual harassment.  Although Brion Boykins was terminated as a result of several complaints and investigations, Fairfield's management and HR employees have taken insufficient action to punish the conduct described herein and to establish a respectful environment.   In only addressing one sexual predator, Boykins, HR Management has failed to remedy the pervasive sexual harassment occurring at Fairfield's Las Vegas facility.

188.    Fairfield's policies and procedures condone sexual harassment and/or do not adequately prevent sexual harassment.

### E.     Typicality of Claims and Relief Sought

189.    The claims of the Class Representatives are typical of the claims of the Class. The Class Representatives assert claims in each of the categories of claims they asserted on behalf of the Class.  The relief sought by the Class Representatives for the sexual harassment and gender discrimination complained of herein is also typical of the relief sought on behalf of the Class.

190.    The Class Representatives are, like all the members of the Class, all female employees who have worked for Fairfield during the liability period.

191.    The sexually hostile work environment at Fairfield and Fairfield's discrimination in promotion, advancement and training affects the Class Representatives and all the employee Class members in the same manner.

192.    Differential treatment between male and female employees occurs as a pattern and practice throughout all levels and departments of Fairfield.  Male employees are treated more favorably than female employees, routinely receive more profitable work assignments than female employees, and thus enjoy a greater earning potential than their female counterparts and receive other forms of preferential treatment.

193.    Sexual harassment occurs as a pattern and practice throughout all levels and departments of Fairfield and affects the Class Representatives and the members of the Class in the same manner.  Male managers and employees regularly hold sexually explicit conversations, make sexually hostile jokes and remarks, comment on female employees' bodies, harass and intimidate female employees, inappropriately touch, hug, and kiss female employees, make unwelcome sexual advances on female employees, demand sexual favors from female employees in exchange for professional advancement, and practice other forms of sexual harassment.

194.     Several of the Class Representatives, and numerous other female employees, have repeatedly complained to Fairfield's management and HR about gender discrimination and a sexually hostile work environment.  Company investigations into these complaints have been inadequate and/or superficial.  The Class Representatives and Class members have been affected in the same ways by Fairfield's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination.

195.     Despite ample evidence and knowledge about Fairfield's rampant gender discrimination and sexual harassment held by not only HR personnel but also among high-level corporate executives, Fairfield has failed to create adequate incentives for, and oversight over, its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices, and/or procedures referenced in this Complaint.  Fairfield has also failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws.  These failures have affected the Class Representatives and the Class members in the same ways.

196.     The relief necessary to remedy the claims of the Class Representatives is exactly the same as that necessary to remedy the claims of the proposed Class members in this case.  The Class Representatives seek the following relief for their individual claims and for those of the members of the proposed Class: (a) a declaratory judgment that Fairfield has engaged in systemic gender discrimination against female employees by subjecting them to severe sexual harassment and gender hostility at work, limiting their ability to be promoted to better and higher paying positions, and exposing them to differential and inequitable treatment; (b) a permanent injunction against such continuing discriminatory and harassing conduct; (c) injunctive relief which effects a restructuring of Fairfield's promotion, training, selection, compensation, work

environment and discipline policies and/or procedures so that females will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher paying classifications with terms and conditions of employment traditionally enjoyed by male employees; (d) injunctive relief which effects a restructuring of Fairfield's policy and practice so that male employees who sexually harass female employees and/or create gender hostility in the workplace are granted zero tolerance; (e) injunctive relief which effects a restructuring of the Fairfield workforce so that females are promoted into higher and better paying classifications which they would have held in the absence of Fairfield's past gender discrimination; (f) back pay, front pay, and other equitable remedies necessary to make the female employees whole from the Fairfield's past discrimination and harassment; (g) compensatory damages; (h) punitive and nominal damages to prevent and deter Fairfield from engaging in similar discriminatory practices in the future; and (i) attorneys' fees, costs, and expenses associated with this litigation.

## F.    Adequacy of Representation

197.    The Class Representatives' interests are co-extensive with those of the members of the proposed Class which they seek to represent in this case.  The Class Representatives seek to remedy Fairfield's discriminatory employment policies, practices, and/or procedures so that females will no longer be prevented from advancing into higher paying and more desirable positions, will not receive disparate pay and differential treatment, and will not be subjected to sexual harassment and gender hostility at work.  The Class Representatives are willing and able to represent the proposed Class fairly and vigorously as they pursue their similar individual claims in this action.  The Class Representatives have trained counsel who are qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination Class action of this size and complexity.  The combined

interests, experience and resources of the Class Representatives and their counsel to litigate competently the individual and Class claims at issue in this case clearly satisfy the adequacy of the representation requirement of Fed. R. Civ. P. 23(a)(4) and Nev. R. Civ. P. 23(a)(4).

**G.      Requirements of Fed. R. Civ. P. 23(b)(2) and Nev. R. Civ. P. 23(b)(2)**

198.    Fairfield has acted on grounds generally applicable to the Class Representatives and the proposed Class by adopting and following systemic policies, practices, and/or procedures which are discriminatory on the basis of gender.  Sexual harassment and gender discrimination are Fairfield's standard operating procedures rather than sporadic occurrences.  Fairfield has refused to act on grounds generally applicable to the Class by, *inter alia*: (a) refusing to provide a working environment that is free of sexual harassment and gender hostility; (b) refusing to implement policies that adequately address and remedy female employees' complaints of sexual harassment and gender hostility; (c) refusing to provide sufficient enforcement to prevent male employees from sexually harassing female employees; (e) refusing to adopt and apply pay, promotion, advancement, and compensation policies, practices, and/or procedures which do not have a disparate impact on, or otherwise systemically discriminate against, females; and (f) refusing to provide equal terms and conditions of employment for females.  Fairfield's systemic discrimination and refusal to act on grounds that are not discriminatory make appropriate the requested final injunctive and declaratory relief with respect to the Class as a whole.

199.    Injunctive and declaratory relief are the predominant forms of relief sought in this case because those forms are the culmination of the proof of Fairfield's individual and Class-wide liability at the end of Stage I of a bifurcated trial and the essential predicate for the Class Representatives' and Class members' entitlement to monetary and non-monetary remedies at Stage II of such trial.  Declaratory and injunctive relief flow directly and automatically from

proof of the common questions of law and fact regarding the existence of systemic sexual harassment and gender discrimination of female employees at Fairfield. Such relief is the factual and legal predicate for the Class Representatives' and the Class members' entitlement to monetary and non-monetary remedies for individual losses caused by such systemic discrimination and harassment.

### H.    Requirements for Fed. R. Civ. P. 23(b)(3) and Nev. R. Civ. P. 23(b)(3)

200.    The common issues of fact and law affecting the claims of the Class Representatives and Class members, including but not limited to the common issues identified above, predominate over any issues affecting only individual claims.

201.    A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class Representatives and Class members.

202.    The cost of proving Fairfield's pattern and practice of discrimination makes it impracticable for the Class Representatives and members of the proposed Class to control the prosecution of their claims individually.

## VIII.  CLASS ALLEGATIONS

203.    The Class Representatives and Class members have been subjected to a systemic pattern and practice of sexual harassment and gender discrimination involving a battery of practices that have had an unlawful disparate impact on them and their employment opportunities.

204.    The sexual harassment to which female Fairfield employees are subjected occurs on a regular basis and is practiced by male managers and employees at all levels. This harassment includes, but is not limited to, explicit sexual conversations, sexually hostile jokes and remarks, inappropriate sexual comments about female employees' bodies, sexual

46

intimidation of female employees, inappropriate touching, hugging and kissing, and unwelcome sexual advances and propositions.

205.    Fairfield condones sexual harassment by refusing or failing to take adequate action against male employees who have sexually harassed female employees and by failing to adequately respond to numerous complaints from female employees regarding the sexual harassment they have experienced.  Management in Fairfield's Las Vegas facility, HR, and high-level corporate executives in Fairfield's corporate headquarters in Orlando are all well aware of the existence of rampant sexual harassment at Fairfield, yet no reasonable effort has been made to remedy the problem.

206.    The gender discrimination includes adhering to a policy and practice of restricting the promotion and advancement opportunities of female employees so that they remain in the lower classification and compensation levels.  Fairfield, in effect, bars females from better and higher positions which have traditionally been held by male employees.  The systemic means of accomplishing such gender stratification include, but are not limited to, Fairfield's promotion, advancement, training, and compensation policies, practices, and/or procedures.

207.    Fairfield's promotion, advancement, training, and compensation policies, practices, and/or procedures incorporate the following discriminatory practices: (a) sexually harassing female employees by demanding sexual favors from them in exchange for professional advancement opportunities; (b) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional gender bias and sexual harassment; (c) subjecting females to gender hostility in the work environment; (d) relying upon subjective judgments, procedures, and criteria which permit and encourage the incorporation of gender stereotypes and bias by Fairfield's predominately male-managerial and

supervisory staff in making promotion, training, and compensation decisions; (e) refusing or failing to provide equal training opportunities to females; (f) refusing or failing to provide females with equal opportunities to demonstrate their skills and qualifications for advancement, including routinely assigning them less profitable work than male employees; (g) using informal, subjective selection methods which allow for rampant gender discrimination; and (h) discouraging applications and expressions of interest in career opportunities by females.

208.    Fairfield's promotion policies, practices, and/or procedures have had a disparate impact on the Class Representatives and Class members.  Such procedures are not valid, job-related, or justified by business necessity.  There are alternative, objective, and more valid selection procedures available to Fairfield that are more closely related to the actual responsibilities of the positions and that would have less of a disparate impact on females. However, Fairfield has failed or refused to use such alternative procedures.

209.    Fairfield's promotion, advancement, training, and compensation policies, practices, and/or procedures are intended to have disparate impact on the Class Representatives and the Class they seek to represent.  Such practices form a part of Fairfield's overall pattern and practice of keeping females in the lower classifications which have less desirable terms and conditions of employment.

210.    In addition, Fairfield condones sexual harassment by failing to provide adequate training on the issues of sexual harassment and gender hostility.  Fairfield's policies and procedures also condone sexual harassment and/or allow for sexual harassment by not adequately preventing it.  Those policies and procedures prohibiting sexual harassment and gender hostility that do exist are subjectively and inconsistently interpreted and applied, and thus have lost their intended impact.

211.    Fairfield's policies, practices, and/or procedures concerning sexual harassment, gender hostility, and other Human Resources issues are intended to have a disparate impact on the Class Representatives and Class members.  These practices contribute to an overarching pattern and practices of creating a hostile work environment based on gender in which female employees are denied equality in terms and conditions of employment.

212.    Because of Fairfield's systemic pattern and practice of sexual harassment and gender discrimination, the Class Representatives and Class members have been adversely affected and have experienced harm, including the loss of compensation, wages, back pay and employment benefits.  This pattern and practice of sexual harassment and gender discrimination includes: being subjected to rampant sexual harassment by male managers and employees on a regular basis; being subjected to a sexually hostile work environment; being denied promotions in favor of equally or less qualified male employees; being denied training opportunities provided to male employees; receiving less profitable work assignments than male employees; being disciplined more frequently and more severely than male employees, as well as being disciplined for engaging in behaviors for which male employees are not disciplined.

213.    The Class Representatives and Class members have been subjected to gender hostility at work, both severe and pervasive, which affects the terms and conditions of their employment.  Fairfield's actions and inactions allow and/or encourage this behavior by its male employees.

214.    The Plaintiffs have no plain, adequate, or complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief.  The Plaintiffs are now suffering, and will continue to suffer, irreparable injury

from Fairfield's unlawful policies, practices, and/or procedures as set forth herein unless those policies, practices and/or procedures are enjoined by this Court.

**Counts for Class Representatives and Class Members**

**COUNT I**

**VIOLATION OF TITLE VII, 42 U.S.C. §§ 2000e <u>et seq.</u>**
**SEXUAL HARASSMENT**

215.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

216.    The Defendants discriminated against Plaintiffs by permitting an ongoing pervasive pattern and practice of sexual harassment and by maintaining a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>, as amended ("Title VII").

217.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives.

218.    Such conduct directly and proximately caused Class Representatives to be damaged and to suffer damages, economic losses, mental and emotional harm, anguish and humiliation.

219.    By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Class Representatives, Class Representatives are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

220.    By reason of the sexual harassment suffered as a result of Defendants' conduct, Class Representatives are entitled to all legal and equitable remedies available under Title VII, including but not limited to punitive damages.

## COUNT II

**VIOLATION OF TITLE VII, 42 U.S.C. §§ 2000e et seq.**
**GENDER DISCRIMINATION**

221.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

222.    The Defendants discriminated against Class Representatives by treating them differently from and less preferably than similarly-situated male employees and subjecting them to discriminatory denials of promotions, discriminatory compensation policies, differential treatment, disparate terms and conditions of employment, hostile work environments and/or other forms of discrimination in violation of Title VII.

223.    Defendants' conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representatives.

224.    Such conduct directly and proximately caused Class Representatives to be damaged and to suffer economic losses, mental and emotional harm, anguish and humiliation.

225.    Defendants' policies and practices have produced a disparate impact against Class Representatives with respect to the terms and conditions of employment.

226.    By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Class Representatives, Class Representatives are entitled to application of the continuing violating doctrine to all of the violations alleged herein.

227.    By reason of the gender discrimination suffered as a result of Defendants' conduct, Class Representatives are entitled to all legal and equitable remedies available under Title VII, including but not limited to punitive damages.

## COUNT III

**VIOLATIONS OF NEVADA LAW**
**NEV. REV. STAT. 613.330**
**GENDER DISCRIMINATION**
**(AGAINST CORPORATE DEFENDANTS)**

228.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

229.    Corporate Defendants have violated Nevada law by treating Class Representatives and Class members less preferably than similarly situated males and by subjecting women to discriminatory denials of promotion, discriminatory compensation policies, differential treatment, disparate terms and conditions of employment, hostile work environment, and/or other forms of discrimination.

230.    Fairfield's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for the rights of the Class Representatives and Class members.

231.    Such conduct directly and proximately caused Class Representatives and the Class members to suffer emotional distress and lost earning potential for which each claims compensatory and punitive damages from Fairfield.

232.    Class representatives and Class members are entitled to all legal and equitable remedies available under Nevada law.

## COUNT IV

**VIOLATIONS OF NEVADA LAW
NEV. REV. STAT. 613.330
SEXUAL HARASSMENT
(AGAINST CORPORATE DEFENDANTS)**

233.     Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

234.     Corporate Defendants have discriminated against Class Representatives by permitting an ongoing, pervasive pattern and practice of sexual harassment by maintaining a sexually hostile work environment, in violation of the laws of the State of Nevada.

235.     Fairfield's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and the Class members.

236.     Such conduct directly and proximately caused the Class Representatives and Class members to be damaged and to suffer damages, economic losses, mental and emotional harm, anguish, and humiliation.

237.     By reason of the continuous nature of Fairfield's discriminatory conduct, persistent throughout the employment of the Class Representatives and Class members, the Class Representatives and Class members are entitled to application of the continuing violation doctrine to all of the violations alleged herein.

238.     By reason of the sexual harassment suffered at Fairfield, the Class Representatives and the Class members are entitled to all legal and equitable remedies available under Nevada law.

## COUNT V

**VIOLATIONS OF NEVADA LAW
NEV. REV. STAT. 200.471
ASSAULT
(AGAINST GREG LIDDLE, MARK VAN SYDNER, KURT PEEZ, KEN GRAY,
PAUL HERMAN, TROY FUBLER, RICHARD ESCOVEDO, KEN ALEXANDER, ART
LOFTIN, AND DON WOOLBRIGHT)**

239.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

240.    This claim arises under the laws of the State of Nevada to redress assault against the Class Representatives and Class members, as well as Fairfield's ratification of that conduct.

241.    Employees of Fairfield named as Defendants in this count intended to cause or attempted to cause harmful, rude, unwanted, offensive touching or corporal injury on the Class Representatives and Class members on several occasions.

242.    The Individual Defendants named in this count caused Class Representatives and Class members to reasonably apprehend a harmful, rude, unwanted, offensive touching or corporal injury on several occasions.

243.    These actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Class Representatives and Class members.

244.    The Individual Defendants named in this count knew or should have known of their unlawful conduct.

245.    Such conduct directly and proximately caused the Class Representatives and Class members to suffer severe emotional distress for which each claims compensatory and punitive damages from the Individual Defendants named in this count.

## COUNT VI

### VIOLATIONS OF NEVADA LAW
### NEV. REV. STAT. 200.481
### BATTERY
### (AGAINST GREG LIDDLE, MARK VAN SYDNER, AND KURT PEEZ)

246.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

247.    This claim arises under the laws of the State of Nevada to redress battery against the Class Representatives and Class members and Fairfield's ratification of that conduct.

248.    Employees of Fairfield named as Defendants in this count subjected the Class Representatives and Class members to intentional, unlawful, harmful, rude, unwanted, offensive, and/or corporal contact or constraint without consent.

249.    Such conduct directly and proximately caused the Class Representatives and Class members to suffer severe emotional distress for which each claims compensatory and punitive damages from the Individual Defendants named in this count.

## COUNT VII

### VIOLATIONS OF NEVADA LAW
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

250.    Class Representatives re-allege and incorporate by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

251.    This claim arises under the laws of the State of Nevada to redress intentional and reckless infliction of emotional distress violations by all Defendants upon the Class Representatives and Class members, and Fairfield's ratification of that conduct.

252.    All Defendants intentionally or recklessly inflicted emotional distress upon Class Representatives and Class members.

253.    The conduct of Defendants was so extreme and outrageous that it clearly exceeded the bounds of decency, making this behavior intolerable in civilized society.

254.    This intentional or reckless infliction of emotional distress resulted in severe mental injuries to Class Representatives and Class members.

255.    Such conduct directly and proximately caused the Class Representatives and Class members to suffer humiliation, embarrassment, degradation, shock, outrage, and serious emotional distress for which each claims compensatory and punitive damages from Defendants.

**COUNT VIII**

**VIOLATIONS OF NEVADA LAW**
**NEGLIGENT AND/OR WANTON SUPERVISION, TRAINING, AND RETENTION**
**(AGAINST CORPORATE DEFENDANTS AND STEVE COEN, KEN ALEXANDER,**
**WALTER LAXON, MASON GANGEL, AND DEVON BOYD)**

256.    Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

257.    This claim arises under the laws of the State of Nevada to redress the negligent and/or wanton supervision, training, and retention of male employees and managers by Defendants.

258.    The Corporate Defendants and the Individual Defendants named in this count negligently and/or wantonly failed to adequately supervise, train, and/or retain male employees and managers, which directly and proximately caused the sexual harassment of, and retention against, the Class Representatives and Class members.

259.    The Corporate Defendants and the individual defendants named in this count took insufficient action, if any, to stop the harassing and/or discriminatory conduct of its employees.

260.     Such conduct directly and proximately caused the Class Representatives and Class members to suffer severe emotional distress for which each claims compensatory and punitive damages from these Defendants.

## COUNT IX

**VIOLATIONS OF NEVADA LAW
NEGLIGENT AND/OR WANTON HIRING
(AGAINST CORPORATE DEFENDANTS AND STEVE COEN, KEN ALEXANDER,
WALTER LAXON, MASON GANGEL, AND DEVON BOYD)**

261.     Class Representatives re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

262.     This claim arises under the laws of the State of Nevada to redress the negligent and/or wanton hiring of male employees and managers by Fairfield.

263.     Upon information and belief, there is evidence that various employees of Defendant were unfit for particular jobs in which they were employed.

264.     Upon information and belief, there is evidence certain applicants for employment by Fairfield, if hired, would pose an unreasonable risk to others.

265.     Such conduct directly and proximately caused the Class Representatives and Class members to suffer severe emotional distress for which each claims compensatory and punitive damages from the Defendants named in this count.

### Individual Count for Lynda Kalemis

### COUNT X

**VIOLATIONS OF TITLE VII
RETALIATION
(AGAINST CORPORATE DEFENDANTS)**

266.     Kalemis re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

267.   Fairfield has retaliated against Kalemis because she insisted upon a work environment free of sexual harassment and gender discrimination and also because she complained about sexual harassment and discrimination.

268.   Fairfield has also retaliated against Kalemis because she filed a Charge of Discrimination with the Nevada Equal Rights Commission.

269.   Fairfield has retaliated against Kalemis by subjecting her to adverse employment actions, including but not limited to, denying her promotions for which she was qualified, terminating her employment, and subjecting her to disparate terms and conditions of employment and/or other forms of discrimination in violation of federal law.

270.   Fairfield's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Kalemis, and she is therefore entitled to punitive damages.

271.   Such conduct directly and proximately caused Kalemis to suffer emotional distress for which she claims compensatory and punitive damages from Fairfield.

272.   By reason of the retaliation suffered at Fairfield, Kalemis is entitled to all legal and equitable remedies available under federal law.

### Individual Count for Rhodalyn Villa

### COUNT XI

**VIOLATIONS OF TITLE VII
RETALIATION
(AGAINST CORPORATE DEFENDANTS)**

273.   Villa re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

274.     Fairfield has retaliated against Villa because she insisted upon a work environment free of sexual harassment and gender discrimination and also because she complained about sexual harassment and discrimination.

275.     Fairfield has retaliated against Villa by subjecting her to adverse employment actions, including but not limited to, denying her promotions for which she was qualified and subjecting her to disparate terms and conditions of employment and/or other forms of discrimination in violation of federal law.

276.     Fairfield's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Villa, and she is therefore entitled to punitive damages.

277.     Such conduct directly and proximately caused Villa to suffer emotional distress for which she claims compensatory and punitive damages from Fairfield.

278.     By reason of the retaliation suffered at Fairfield, Villa is entitled to all legal and equitable remedies available under federal law.

### Individual Count for Rania Dante

### COUNT XII

**VIOLATIONS OF TITLE VII
RETALIATION
(AGAINST CORPORATE DEFENDANTS)**

279.     Dante re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

280.     Fairfield has retaliated against Dante because she insisted upon a work environment free of sexual harassment and gender discrimination and also because she complained about sexual harassment and discrimination.

281.    Fairfield has retaliated against Dante by subjecting her to adverse employment actions, including but not limited to, denying Dante promotions for which she was qualified and subjecting her to disparate terms and conditions of employment and/or other forms of discrimination in violation of federal law.

282.    Fairfield's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Dante, and she is therefore entitled to punitive damages.

283.    Such conduct directly and proximately caused Dante to suffer emotional distress for which she claims compensatory and punitive damages from Fairfield.

284.    By reason of the retaliation suffered at Fairfield, Dante is entitled to all legal and equitable remedies available under federal law.

**Individual Count for Sabra Laursen**

**COUNT XIII**

**VIOLATIONS OF NEVADA LAW**
**NEV. REV. STAT. 613.335**
**REFUSAL TO GRANT LEAVE TO PREGNANT EMPLOYEES**
**(AGAINST CORPORATE DEFENDANTS)**

285.    Laursen re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

286.    This claim arises under the laws of the State of Nevada to redress the discrimination Laursen faced based on her pregnancy, particularly at the hands of Senior Manager Dean Owens and Senior Vice President Steve Coen.

287.    Nevada law holds that if an employer grants leave without loss of seniority to his employees for sickness or disability because of a medical condition, it is an unlawful

employment practice to fail or refuse to extend the same benefits to any female employee who is pregnant.

288.    Fairfield treated pregnant women less favorably because males were allowed to take liberal time off without question, while Laursen was refused time off work before and after her miscarriage.

289.    Such conduct directly and proximately caused Laursen to suffer severe emotional distress for which she claims compensatory and punitive damages from Fairfield.

## Individual Count for Doreet Hakman

## COUNT XIV

### VIOLATIONS OF TITLE VII
### RETALIATION
### (AGAINST CORPORATE DEFENDANTS)

290.    Hakman re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

291.    Fairfield has retaliated against Hakman because she insisted upon a work environment free of gender discrimination and also because she complained about discrimination.

292.    Fairfield has retaliated against Hakman by subjecting her to adverse employment actions, including but not limited to, denying Hakman promotions for which she was qualified and subjecting her to disparate terms and conditions of employment and/or other forms of discrimination in violation of federal law.

293.    Fairfield's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Hakman, and she is therefore entitled to punitive damages.

294.    Such conduct directly and proximately caused Hakman to suffer emotional distress for which she claims compensatory and punitive damages from Fairfield.

295.    By reason of the retaliation suffered at Fairfield, Hakman is entitled to all legal and equitable remedies available under federal law.

### Individual Count for Adero Fleming

### COUNT XV

**VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT
WRONGFUL TERMINATION
(AGAINST CORPORATE DEFENDANTS)**

296.    Fleming re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as though fully set forth herein.

297.    Defendants' wrongful termination of Fleming's employment while she was on leave under the Family Medical Leave Act as herein alleged violated the Family and Medical Leave Act, 28 U.S.C. § 2601 *et seq*.

298.    As a proximate result of Defendants' wrongful conduct, Fleming has suffered and continues to suffer loss of earnings, benefits and compensation and have suffered and continue to suffer mental and emotional distress and harm, anguish and humiliation.

299.    Defendants, in doing the acts and failing to do the acts as herein alleged, acted maliciously, oppressively, with the wrongful intent to injure Fleming, and in conscious disregard of Fleming's rights.  Fleming is thus entitled to recover damages from Defendants according to proof.

### PRAYER FOR RELIEF FOR CLASS REPRESENTATIVES AND CLASS MEMBERS

WHEREFORE, Class Representatives, on behalf of themselves and Class members, pray that this Court:

a.      Certify the case as a Class action maintainable under Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3) and Nevada Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3), on behalf of the proposed Plaintiff Class, and designation of the Plaintiffs as representatives of this Class and their counsel of record as Class counsel;

b.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of the Class Representatives, Class members, and those similarly situated as secured by Title VII, Nev. Rev. Stat. 613.330 and order such injunctive relief as will prevent Fairfield from continuing their discriminatory practices and protect others similarly situated;

c.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, sexual harassment, gender discrimination, or retaliation by Fairfield as set forth herein;

d.      Declare and adjudge that Fairfield's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the laws of the State of Nevada;

e.      Order Fairfield to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will grant zero tolerance to any male employees who sexually harass female employees and/or

create gender hostility in the workplace; (iii) will remedy the effects of Fairfield's past and present unlawful employment policies, practices and/or procedures; (iv) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

f.       Order Fairfield to initiate and implement systems of assigning, training, transferring, compensating, and promoting female employees in a non-discriminatory manner;

g.       Order Fairfield to establish a task force on equality and fairness to determine the effectiveness of the programs described above, which would provide for (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described above;

h.       Order Fairfield to adjust the wage rates and benefits for the Class Representatives and the Class members to the level that they would be enjoying but for Fairfield's discriminatory policies, practices, and/or procedures;

i.       Order Fairfield to place or restore the Class Representatives and the Class members into those jobs they would now be occupying, but for Fairfield's discriminatory policies, practices and/or procedures;

j.       Order that this court retain jurisdiction of this action until such time as the Court is satisfied that Fairfield has remedied the practices complained of herein and is determined to be in full compliance with the law;

k.      Award nominal, compensatory, and punitive damages to the Class Representatives and Class members;

l.      Award litigation costs and expenses, including but not limited to, reasonable attorneys' fees, to the Class Representatives and Class members;

m.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by the Class Representatives and Class members to be determined at trial;

n.      Order Fairfield to make whole the Class Representatives and Class members by providing them with appropriate lost earnings, and other affirmative relief;

o.      Award any other appropriate equitable relief to the Class Representatives and proposed Class members; and

p.      Award any additional and further relief as this court may deem just and proper.

## PRAYER FOR RELIEF FOR INDIVIDUAL LYNDA KALEMIS

WHEREFORE, Lynda Kalemis prays that this Court:

a.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, and any conduct violating Kalemis's rights or the rights of others similarly situated as secured by Nevada law, and order such injunctive relief as will prevent Fairfield

from continuing its discriminatory and retaliatory practices and protect others similarly situated;

b.      Declare and adjudge that Fairfield has violated Kalemis' rights under Title VII;

c.      Award Kalemis nominal damages;

d.      Award Kalemis compensatory damages;

e.      Award Kalemis punitive damages;

f.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Kalemis to be determined at trial;

g.      Order Defendants to make Kalemis whole by providing her with appropriate past and future lost earnings and benefits, with the pre-judgment and post-judgment interest, and other affirmative relief;

h.      Award Kalemis the costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and expenses; and

i.      Award Kalemis any such additional and further relief as this Court deems is just and proper.

**PRAYER FOR RELIEF FOR INDIVIDUAL RHODALYN VILLA**

WHEREFORE, Rhodalyn Villa prays that this Court:

a.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, and any

conduct violating Villa's rights or the rights of others similarly situated as secured by Nevada law, and order such injunctive relief as will prevent Fairfield from continuing its discriminatory and retaliatory practices and protect others similarly situated;

b.      Declare and adjudge that Fairfield has violated Villa's rights under Title VII;

c.      Award Villa nominal damages;

d.      Award Villa compensatory damages;

e.      Award Villa punitive damages;

f.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Villa to be determined at trial;

g.      Order Defendants to make Villa whole by providing her with appropriate past and future lost earnings and benefits, with the pre-judgment and post-judgment interest, and other affirmative relief;

h.      Award Villa the costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and expenses; and

i.      Award Villa any such additional and further relief as this Court deems is just and proper.

## PRAYER FOR RELIEF FOR INDIVIDUAL RANIA DANTE

WHEREFORE, Rania Dante prays that this Court:

a.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns,

representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, and any conduct violating Dante's rights or the rights of others similarly situated as secured by Nevada law, and order such injunctive relief as will prevent Fairfield from continuing its discriminatory and retaliatory practices and protect others similarly situated;

b.      Declare and adjudge that Fairfield has violated Dante's rights under Title VII;

c.      Award Dante nominal damages;

d.      Award Dante compensatory damages;

e.      Award Dante punitive damages;

f.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Plaintiff to be determined at trial;

g.      Order Defendants to make Dante whole by providing her with appropriate past and future lost earnings and benefits, with the pre-judgment and post-judgment interest, and other affirmative relief;

h.      Award Dante the costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and expenses; and

i.      Award Dante any such additional and further relief as this Court deems is just and proper.

## PRAYER FOR RELIEF FOR INDIVIDUAL SABRA LAURSEN

WHEREFORE, Sabra Laursen prays that this Court:

a.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, and any conduct violating Laursen's rights or the rights of others similarly situated as secured by Nevada law, and order such injunctive relief as will prevent Fairfield from continuing its discriminatory and retaliatory practices and protect others similarly situated;

b.      Declare and adjudge that Fairfield has violated Laursen's rights under Title VII and Nev. Rev. Stat. 613.335;

c.      Award Laursen nominal damages;

d.      Award Laursen compensatory damages;

e.      Award Laursen punitive damages;

f.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Laursen to be determined at trial;

g.      Order Defendants to make Laursen whole by providing her with appropriate past and future lost earnings and benefits, with the pre-judgment and post-judgment interest, and other affirmative relief;

h.      Award Laursen the costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and expenses; and

i.      Award Laursen any such additional and further relief as this Court deems is just and proper.

**PRAYER FOR RELIEF FOR INDIVIDUAL DOREET HAKMAN**

WHEREFORE, Doreet Hakman prays that this Court:

a.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, and any conduct violating Hakman's rights or the rights of others similarly situated as secured by Nevada law, and order such injunctive relief as will prevent Fairfield from continuing its discriminatory and retaliatory practices and protect others similarly situated;

b.      Declare and adjudge that Fairfield has violated Hakman's rights under Title VII;

c.      Award Hakman nominal damages;

d.      Award Hakman compensatory damages;

e.      Award Hakman punitive damages;

f.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Plaintiff to be determined at trial;

g.      Order Defendants to make Hakman whole by providing her with appropriate past and future lost earnings and benefits, with the pre-judgment and post-judgment interest, and other affirmative relief;

h.      Award Hakman the costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and expenses; and

i.      Award Hakman any such additional and further relief as this Court deems

is just and proper.

## PRAYER FOR RELIEF FOR INDIVIDUAL ADERO FLEMING

WHEREFORE, Adero Fleming prays that this Court:

a.      Issue a permanent injunction against Fairfield and its partners, officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any further unlawful practices, policies, customs, usages, and any conduct violating Fleming's rights or the rights of others similarly situated as secured by federal law, and order such injunctive relief as will prevent Fairfield from continuing its discriminatory and retaliatory practices and protect others similarly situated;

b.      Declare and adjudge that Fairfield has violated Fleming's rights under the Family and Medical Leave Act;

c.      Award Fleming nominal damages;

d.      Award Fleming compensatory damages;

e.      Award Fleming punitive damages;

f.      Award back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Fleming to be determined at trial;

g.      Order Defendants to make Fleming whole by providing her with appropriate past and future lost earnings and benefits, with the pre-judgment and post-judgment interest, and other affirmative relief;

h.      Award Fleming the costs and expenses of this action, including, but not

limited to, reasonable attorneys' fees and expenses; and

i.      Award Fleming any such additional and further relief as this Court deems

is just and proper.

## IX.    **JURY DEMAND**

Plaintiffs hereby request a trial by jury on all issues.

Dated: February 21, 2008                Respectfully submitted,

_/s/ Mary Chapman_____
David W. Sanford, D.C. Bar No. 457933
Shayna Bloom, D.C. Bar No. 498105
**SANFORD, WITTELS, AND HEISLER, LLP**
1666 Connecticut Ave. NW, Suite 310
Washington DC, 20009
Telephone: (202) 742-7780
Facsimile: (202) 742-7776

Grant E. Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave. NW, Suite 310
Washington DC, 20009
Telephone: (202) 742-7783
Facsimile: (202) 742-7776

Mary Chapman, Nevada Bar No. 6591
**LAW OFFICES OF MARY F. CHAPMAN, LTD.**
7465 W. Lake Mead Blvd., Suite 100
Las Vegas, NV 89128
Telephone: (702) 562-1246
Facsimile: (702) 562-1247